355 So.2d 150 (1978)
Jean Florin ALBERS, Administratrix Ad Litem for the Estate of Edgar H. Albers, Jr., Deceased, Appellant,
v.
George A. DASHO, Appellee.
No. 76-1048.
District Court of Appeal of Florida, Fourth District.
February 14, 1978.
Rehearing Denied March 15, 1978.
*151 John W. Williams, Jr., of Montgomery, D'Aiuto & Williams, St. Petersburg, for appellant.
Edward A. Perse of Horton, Perse & Ginsberg, and Nance & Cacciatore, Miami, for appellee.
DOWNEY, Judge.
Appellant's decedent, Edgar H. Albers, Jr., was driving east across a bridge on State Road 520 in the City of Cocoa Beach, Florida, at approximately 12:12 a.m. As he proceeded across the bridge the plaintiff, George A. Dasho, and a companion were crossing the bridge on foot from north to south and Dasho and companion were hit by Albers' car and severely injured. This suit by Dasho resulted and he was awarded a gross jury verdict of $375,000 and he was found to be 66% negligent.
At the time of the accident it was, of course, dark; there were no lights for illumination constructed on the bridge; the bridge consisted of two lanes of traffic in each direction separated by a striped median; there were a number of people fishing or shrimping from the bridge and Albers was familiar with the location and presence of people on the bridge. The speed limit on the bridge and for 100 feet west thereof was 45 miles per hour. To the west of that area the speed limit was 55 miles per hour.
Albers was deceased at the time of trial, but his deposition was introduced into evidence. He testified that he was proceeding east at about 50 miles per hour. When he approached the bridge he reduced his speed to about 35 miles per hour with his lights on low beam. "A split second" before impact he saw Dasho and his companion. He slammed on his brakes but was unable to avoid colliding with them.
Albers' wife, Jean, was following behind him in another car. She corroborated the fact that he had his lights on and she estimated his speed at about 40 miles per hour. She testified that all of a sudden two people in a trot darted out in front of her husband's car.
Another witness, John Saterides, was standing on the south side of the bridge near the point of impact. He was watching Dasho and his companion crossing the bridge toward him. He testified that Dasho's female companion was leading Dasho and they were in like a trot, or a fast walk. They were kind of skipping. She was laughing and Dasho was telling her something.
For purposes of this opinion the crucial part of Saterides' testimony was that, as Dasho and companion were crossing the bridge, there was traffic approaching from the west because he could see the headlights of automobiles. In describing the speed of Albers' car, Saterides made the following statements in response to questions from counsel:
"Q. All right, then what happened, when they got across the center lines?
"A. She was leading him. They was like in a trot, a fast walk, and I was standing, looking at them, and I was thinking about the net and the boy, he  the boy was with me  he was right behind me. I told him to stay there. When I turned back around and seen them coming, after they crossed this line, it's like a car came out of nowhere and I heard a horn blow.
* * * * * *
"Q. In the eastbound lanes, were there any cars right in the immediate area, other than the Volkswagon
* * * * * *
"A. No, there wasn't nothing coming.
* * * * * *

*152 "Like I said, this guy come out of nowhere, because I was standing way out, looking. I would have spotted the lights, and when I looked at this angle, like this, I just took a quick glance... .
"Q. Did the Volkswagon have its lights on, if you know?
"A. Here's what I saw. I seen like a picture, seen like lights, brakes and two people getting hit an instant later. That's what it  I can't recall if he come up the road without lights, or with lights. I can't say that.
* * * * * *
"Q. Okay, fine. Now, Mr. Saterides, my question was  did you have an opportunity to form an opinion as to the speed of the Volkswagon?
* * * * * *
"A. The speed limit by there is about forty-five and I'd say the guy was going about forty-five or fifty-five. That's the way all that traffic goes in there.
* * * * * *
"Q. Okay, did you have an opportunity to form an opinion as to the speed of the Volkswagon?
"A. Yes, I did.
* * * * * *
"Q. The next question, what 
"A. Some insurance man asked me, when I was working at Florida Bulk Transport Trucking. Some  I took a rough guess that the Volkswagon was going anywhere  about fifty, I guess.
* * * * * *
"And the guy came to where I was working, and he asked me those questions, you know. I more or less just gave him a statement of what I saw, and he asked me  the way he put it is if I could take a rough guess on how fast the Volkswagon was going. I said I believe it was forty-five or fifty.
"Q. My question is what is your opinion as to the speed of the Volkswagon?
* * * * * *
"A. I'd say fifty.
"Q. All right. Fine.
"A. Because he hit them pretty hard.
* * * * * *
"I can't recall, because it's just about that time is when the car came and I spotted the car, so I couldn't tell which way they was looking. I think I didn't even get my throat half cleared, when the car hit him  just hit the brakes and smashed her all up.
"Q. You said you heard a horn, is that right?
"A. Yes.
"Q. Did you hear the horn before you saw the car?
"A. I heard the horn about  it was about two feet away from them  three feet.
"Q. Did all this happen just like the snap of a finger?
"A. Yes. What I got to see was like a picture of it.
"Q. Just a sudden flash?
"A. It wasn't a sudden flash.
"Q. As I understand it, you said you had a picture in your mind of seening lights, hearing brakes and two people getting hit. Was that essentially your testimony?
"A. Yes.
* * * * * *
"Q. When you first saw the Volkswagon, it had its lights on, did it not?
"A. Like I said, that Volkswagon came from nowhere.
* * * * * *
"When I first seen it, it was about three feet away from them, with its lights on and blowing its horn. I don't know where it came from.
* * * * * *

*153 I can't recall. I can't recall which way he was looking. All I know is I think they both spotted the car at the same time I did.
"Q. Okay.
"A. Like I said, she turned and looked right at the car, and he was jerking her back. I still say I'd like to know where that guy came from.
* * * * * *
"Q. When you looked to the west, did you see the Volkswagon?
"A. No. No, I didn't see any Volkswagon. The only time I seen that Volkswagon was when it hit them, and after it hit them, I went and looked at it."
Appellant has presented for our consideration four points on appeal, all of which pertain to jury instructions except one which has to do with the admission of witness Saterides' testimony. We find no error in the jury instructions, but do find error in the admission of Saterides' testimony. The evidentiary question involved in the admission of his testimony is whether its admissibility was a question of competence or weight. Predictably, appellant says it's one of competence and appellee opts for weight.
The rule governing the admissibility of opinion evidence as to speed is no better stated anywhere than in 31 Am.Jur.2d, Expert and Opinion Evidence § 157, wherein the text writer states:
"An estimate of the speed at which a conveyance or other object was moving at a given time is generally viewed as a matter of common observation rather than expert opinion, and it is well settled that any person of ordinary ability and intelligence having the means or opportunity of observation is competent to testify to the rate of speed of such a moving object.
* * * * * *
"Speed being a physical phenomenon difficult of accurate ascertainment with respect to a moving object in plain view, an interval of time of sufficient length to give the critical faculties an opportunity to function in formulating a judgment with respect to it must elapse; that time element should be of such reasonable duration as to warrant a conclusion that the opinion is grounded in probability and removed from the realm of speculation. In some cases, therefore, where the witness had only a brief view of the vehicle in question, his opinion as to its speed has been held inadmissible. But under the circumstances of other cases, even though the witness had only a brief opportunity to observe the speed of the vehicle in question, his opinion as to its speed was held admissible, and the fact that he had only a brief time to observe the vehicle was regarded as affecting only the weight of his testimony and not its competency." (Footnotes omitted.) (Emphasis supplied.)
These questions are more easily answered in the abstract than when applying them to concrete factual situations. But if we are going to pay more than mere lip service to the rule that before one can render an opinion he must have had sufficient opportunity to observe the subject matter about which his opinion is rendered, then in the first instance the court must be the arbiter of the competency of the witness to state an opinion. To suggest otherwise would allow anyone to venture an opinion about anything and let the jury determine what weight to ascribe to it.
Our careful study of this record and in particular Mr. Saterides' testimony convinces us that Mr. Saterides' testimony was subject to objection on the grounds of competency. It is clear to us that reasonable men could not differ on the question of his opportunity to observe Albers' car a sufficient time to give a reliable estimate of its speed. Saterides only saw the car the instant before impact. His opinion is based upon such unreliable factors as "that's the way the traffic goes in there" and "because he hit them pretty hard". In arriving at *154 this conclusion we have not overlooked the propensity of witnesses to say "I guess" or "I would say about" when they are stating a firm opinion. Taking Saterides' testimony in context his "I guess" was literally a guess and that sort of testimony is not competent.
It is suggested in appellee's brief that even if not admissible the admission of Saterides' testimony was harmless error at worst. But this testimony goes to one of the core questions affecting liability and we can not say with any certitude that it did not affect the percentage of negligence attributed to Albers and consequently the amount of damages.
In view of the foregoing, the judgment appealed from is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
ANSTEAD and MOORE, JJ., concur.